IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL DOCKET NO.: 3:09CV381-RLV

| | |
|---|---|
| KIMBERLY McCALLUM, )<br>              Plaintiff, )<br>)<br>v. )<br>)<br>BILLY GRAHAM EVANGELISTIC )<br>ASSOCIATION, )<br>              Defendant. )<br>_____ ) | Memorandum and Order |

**THIS MATTER** is before the Court on Defendant's Motion To Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction or, in the alternative, under Rule 12(b)(6) for failure to state a claim upon which relief could be granted. (Document #4)   All related memoranda in support and in opposition are also before the Court. (Documents ##8,9)

**I.  Factual Background**

In October 2003, Plaintiff Kimberly McCallum ("McCallum") began work with Billy Graham Evangelistic Association ("BGEA"), a non-profit religious organization, as a Resource Correspondent for the Christian Guidance Department. (Compl. ¶¶4,5)

In February 2007, McCallum was recruited by Global Officer Sean Campbell to work as an Administrative Assistant in the Global Ministries Division.  (Compl. ¶6)  At the time, McCallum was the only African-American working in BGEA's executive offices.  (Compl. ¶7)  As an Administrative Assistant in Global Ministries, McCallum was responsible for "providing support to the global overseas offices, which included drafting correspondence and certain clerical tasks, and providing assistance to Dr. Campbell's Executive Assistant, Cindy Owen."

(Compl. ¶8) According to the Complaint, "Ms. Owen generally would not accept any assistance from [McCallum] ...even though [Owen] frequently complained that she was overworked." (Compl. ¶8) Occasionally, McCallum was assigned to assist people in other departments. (Compl. ¶8)

In July 2007, McCallum was asked to assist with a summer camp component of the "Dare To Be A Daniel Project."[1] (Compl. ¶9) McCallum was required to contact churches that BGEA routinely invited to its Crusades and other BGEA events to recruit campers to fill vacancies in the program. (Compl. ¶9) During her work on this project, McCallum observed that only three (3) of the 635 churches identified as regular BGEA invitees were primarily African-American congregations. (Compl. ¶10) McCallum claims that black churches located on the same streets as white churches on the BGEA list of invitees were excluded, "as if the compiler had deliberately skipped over the black congregations." (Compl. ¶10) McCallum became concerned that BGEA was intentionally inviting only white people to its events. (Compl. ¶10) McCallum shared her concern with Dr. Campbell, who referred McCallum to Mr. Robert Hill ("Hill"), "who worked with Mr. Franklin Graham and should be able to explain how the list had been compiled." (Compl. ¶11) When McCallum spoke with Hill, Hill advised he would "look into the matter and get back to her within two weeks." (Compl. ¶12)

One week later, McCallum was notified that the department was being downsized and her job was being eliminated effective August 31, 2007. (Compl. ¶13) According to McCallum, her work performance was satisfactory in every way and Campbell never voiced any concern about

---

[1] The undersigned takes judicial notice that BGEA's "Dare To Be A Daniel" program consists of an evangelism training course for children ages 9 through 14. *See* "http://billygraham.org/d2bd_index.asp."

the quality of her work. (Compl. ¶13)

Owen continued to complain about being overworked amidst the downsizing. (Compl. ¶14) Per McCallum, a white project manager that had recently completed a project and had no current duties, was allowed to remain on the payroll pending the creation of another position for her.[2] (Compl. ¶15)

McCallum sought out BGEA's Senior Recruiter, Maxine Ryback ("Ryback"), for help finding another position within BGEA. (Compl. ¶15) McCallum alleges that "[a]lthough there were several vacancies she was qualified to fill, Ms. Ryback offered her little opportunity to interview, and actively prevented plaintiff from applying for at least one position for which she was extremely well qualified." (Compl. ¶15) Plaintiff concedes that she elected not to pursue a bookstore opening because of the discrepancy in pay. (Compl. ¶16)

During the period of time between being notified of her pending displacement and separation from BGEA, McCallum did some work for Mike Beresford, Director of Church Relations. Beresford offered McCallum a future position as an Administrative Assistant which she accepted. (Compl. ¶17) Shortly thereafter, McCallum was advised by Ryback that the Administrative Assistant position Beresford sought to hire her for might not be approved or funded until 2008. (Compl. ¶18) The offer to McCallum was ultimately withdrawn. (Compl. ¶18)

McCallum's employment with BGEA terminated on August 31, 2007. (Compl. ¶19)

Approximately one (1) month later, in October 2007, a white employee from

---

[2] The Complaint does not state how long the white project manager was kept on the payroll pending a new assignment.

housekeeping was promoted to work as Mr. Beresford's Assistant. (Compl. ¶20) McCallum alleges the woman was less qualified for the position than she was. (Compl. ¶20)

McCallum later discovered that the only position eliminated from the Global Ministries Division as a result of "downsizing" was hers. (Compl. ¶21)

In June 2009, McCallum commenced litigation against BGEA in the Superior Court of Mecklenburg County. Plaintiff's Complaint alleges that Defendant BGEA's employment actions violated Title VII of the Civil Rights Act of 1964 ("Title VII"), North Carolina's public policy, N.C. GEN. STAT. §143-422.2 (2009), and 42 U.S.C. §1981.[3] More specifically, McCallum alleges racial discrimination in the workplace and / or retaliation for opposing unlawful discrimination in the workplace.

On September 2, 2009, BGEA filed a Notice of Removal to this Court pursuant to 28 U.S.C. §§1441 and 1446. BGEA moved for dismissal based upon either lack of subject matter jurisdiction or failure to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(1) and (6).

## II. Standard of Review

**A. FED. R. CIV. P. 12(b)(1)**

"In considering a 12(b)(1) motion, the complaint will be construed broadly and liberally.... However, unlike a 12(b)(6) analysis, the court will not draw argumentative inferences in favor of the plaintiff.... [T]he court may [also] consider exhibits outside the pleadings without converting the proceeding into one for summary judgment." Smith v. Raleigh Dist. of North

---

[3] McCallum exhausted her administrative remedies under Title VII by filing a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl. ¶25) Plaintiff's Complaint was then filed within ninety days of receiving her EEOC right-to-sue letter. (Compl. ¶25)

Carolina Conference of United Methodist Church, 63 F.Supp.2d 694, 699 (E.D.N.C. 1999) (analyzing ministerial exception case as Rule 12(b)(6) issue rather than 12(b)(1) and converting to summary judgment) (*internal citation omitted*); see also Hopkins v. DeVeaux, 2011 WL 938298 (N.D.Ga. March 16, 2011) (holding that ministerial exception issue is more appropriately treated as a motion pursuant to Rule 12(b)(6) or 12(c) than a jurisdictional question under Rule 12(b)(1)). The burden of proof is on the party asserting federal subject matter jurisdiction. *See* Smith, 63 F.Supp. 2d at 699.

### B. Fed. R. Civ. P. 12(b)(6)

In order to survive a motion to dismiss under Rule 12(b)(6), Plaintiff's allegations must provide "enough facts to state a claim to relief that is plausible on its face" and show that the Defendant inflicted a legally cognizable harm upon Plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The Court "need not accept the legal conclusions drawn from the facts" nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (*quotation omitted*).

A complaint should be dismissed when its claims only permit the Court to infer "the mere possibility of misconduct" but are not sufficient to show that the requested relief is "plausible." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1950 (2009). In considering the plausibility of a claim, the Court must disregard conclusory statements unsupported by factual allegations. Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 1951.

### III. Discussion

### A. The Church Autonomy Doctrine Does Not Defeat Subject Matter Jurisdiction

Title VII of the Civil Rights Act of 1964 prohibits an employer from "discharg[ing] any individual, or otherwise ... discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e–2(a). Within Section 702, Title VII exempts certain employment decisions of religious organizations:

> This subchapter shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. §2000e-1 (1982); *See* Rayburn v. Gen. Conference of Seventh-Day Adventists, 772 F.2d 1164, 1166-67 (4th Cir.1985). The Fourth Circuit Court of Appeals has construed Title VII's statutory exemption for religious institutions narrowly to preclude a Title VII action for employment decisions *based upon religious preferences* but not decisions based on race, sex, or national origin. *See* Rayburn, 772 F.2d at 1166-67. Thus, in a Title VII action involving employment within a religious organization, there is potential for Title VII to "collide" with constitutional limits imposed pursuant to the First Amendment. Rayburn, 772 F.2d at 1168.

Grounded in First Amendment jurisprudence, the Church Autonomy Doctrine relies on the principle that churches have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." Rayburn, 772 F.2d at 1167 (*quoting* Kedroff v. St. Nicholas Cathedral, 344 U.S. 94, 116 (1952)). As explained in Rayburn, the Church Autonomy Doctrine is based upon both the First Amendment's Free Exercise Clause

and Establishment Clause, which prohibits "excessive government entanglement" with religious institutions. Id. at 1167-72.

"The right to choose ministers without government restriction underlies the well-being of religious community, for perpetuation of a church's existence may depend upon those whom it selects to preach its values, teach its message, and interpret its doctrines both to its own membership and to the world at large." Rayburn, 772 F.2d at 1167-68 (recognizing development of the "ministerial exception" to Title VII) (*citing* Serbian Orthodox Diocese v. Milivojhevich, 426 U.S. 696, 713 (1976)). Accordingly, "[a]ny attempt by government to restrict a church's free choice of its leaders thus constitutes a burden on the church's free exercise rights." Rayburn, 772 F.2d at 1168 (describing balancing of interests; the burden on the church's free exercise of religion against the state's interest in assuring equal employment opportunities for all regardless of race, sex or national origin) (*citing* Wisconsin v. Yoder, 406 U.S. 205, 214 (1972) and Sherbert v. Verner, 374 U.S. 398, 403 (1963)).

The Church Autonomy Doctrine does not, however, protect all employment decisions of a religious organization. In Title VII cases involving an ordinary lay employee within the church, a religious organization's First Amendment right of free exercise is less likely to be implicated. Rayburn, 772 F.2d at 1169; Smith v. Raleigh District of North Carolina Conference of the United Methodist Church, 63 F.Supp.2d 694, 705 (4th Cir.1999); E.E.O.C. v. Mississippi College, 626 F.2d 477 (5th Cir.1980) (Title VII properly applied to secular employment decisions of religious institution such as hire of a secular teacher in a church-approved school). "For instance, the exception would not apply to employment decisions concerning purely custodial or administrative personnel." Hopkins v. Deveaux, 2011 WL 938298 (N.D.Ga. March 16, 2011)

(*quoting* E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C., 213 F.3d 795, 801 (4th Cir.2000)); Leaphart v. American Friends Service Committee, 2008 WL 4682626 (E.D.Pa. 2008) (ministerial exception not applied where plaintiff sought positions that were not pastoral or ministerial in nature).

In considering whether to apply the ministerial exception in the context of non-ministerial or lay employees, courts focus on the employee's primary functions and duties (the "primary duties test") as opposed to title. In Rayburn, the Fourth Circuit explained:

> If the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship,' or the position is 'important to the spiritual and pastoral mission of the church,' the party may be considered a 'minister for purposes of the ministerial exception."

Rayburn, 772 F.2d at 1169; *see also* Hopkins v. DeVeaux, 2011 WL 938298, *8 (applicability of the ministerial exception "does not always lead to a readily apparent answer," particularly when applied to religious institution employees who are not ministers) (*quoting* Rweyemamu v. Cote, 520 F.3d 198, 206-07 (2nd Cir.2008)).[4] Application of the primary duties test "necessarily requires a court to determine whether a position is important to the spiritual and pastoral mission of the church." Id. (*citing* Southwestern Seminary, 651 F.2d at 283.) The more closely the employee's duties and responsibilities are tied to ministering, the less likely courts are to apply Title VII to employment decisions made by the religious institution. *See* Rayburn, 772 F.3d at

---

[4] The undersigned agrees with Plaintiff that the Alicea-Hernandez and Bell cases cited by Defendant BGEA are distinguishable because of the positions held by the plaintiffs in those cases. *See* Alicea-Hernandez v. Catholic Bishop of Chicago, 320 F.3d 698 (7th Cir.2003) (Title VII claim brought by plaintiff communications manager responsible for writing press releases and addressing media as liaison for church barred by First Amendment); Bell v. Presbyterian Church, 126 F.3d 328 (4th Cir.1997) (dismissing minister's breach of contract claim as barred by the church autonomy doctrine).

1168; McCants v. Alabama- West FL Conference of the United Methodist Church, Inc., 2009 WL 1537868 (S.D.Ala. 2009); *see also* 1 EDC ANAFED §12:22 ("The more "pervasively religious" the relationship between an employee and his employer, the more salient the free exercise concern becomes.") (*citing* Rweyemamu, 2008 WL 746822).

Accordingly, the Court must determine whether McCallum's Administrative Assistant position could be considered "important to the spiritual and pastoral mission of the church." Rayburn, 772 F.2d at 1169 (primary duties necessarily require a court to determine whether a position is important to the spiritual and pastoral mission of the church) (*citing* Southwestern Baptist Seminary, 651 F.2d 277, 283 (5th Cir.1981)).

Although Rayburn involved a purely ministerial position, the Fourth Circuit's teachings in Rayburn are instructive here. Plaintiff Rayburn, a white female, applied for an Associate Pastor position and Associate Pastoral Care Internship position but was not selected for either. Rayburn, 772 F.2d at 1165. Rayburn claimed that she was not chosen for employment because 1) she was a female; 2) she associated with black persons and was a member of a black-oriented religious organizations; and 3) she opposed practices made unlawful by Title VII. Id. The Fourth Circuit held that the Associate Pastor positions involved tasks similar to those performed by ordained ministers and would require the candidate to coordinate and plan services, counsel, preach, and hold classes.[5]  Id.  Thus, both positions were fairly characterized as "ministerial" as the primary job functions were found to "embod[y] the basic purpose of the religious institution that state scrutiny of the process for filling the position would raise constitutional problems; ..."

---

[5] At the trial level, limited discovery was permitted to learn more about the nature of the Associate Pastor and Associate in Pastoral Care positions. The trial court distinguished the Associate Pastor positions Rayburn applied for and quasi-secular employment, such as publishing and teaching.

such that "the burden of potential interference [was considered] extraordinary." Id. at 1168. Finding that the church's free exercise of religion was threatened, and that the danger of excessive government entanglement with religion was likewise implicated, the Rayburn panel affirmed the lower court's decision granting summary judgment in favor of defendants.[6]

At this stage of the proceedings, BGEA has not demonstrated that the Church Autonomy Doctrine bars Plaintiff's lawsuit or that McCallum's former job as an Administrative Assistant in Global Ministries falls within the ministerial exception. Here, McCallum's position did *not* entail traditional ministerial functions such as teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship. Nothing in the record suggests that McCallum had decisionmaking authority or substantive input regarding the content of BGEA's religious message, the delivery or expression of the message, or its intended audience. As discussed, *supra*, McCallum's primary function was to provide administrative or clerical support. At best, because McCallum worked within Global Ministries, BGEA could argue that McCallum was important, albeit indirectly, to BGEA's spiritual and pastoral mission. However, the record, taken in the light most favorable to Plaintiff, may be interpreted as showing that McCallum was not in a leadership role within the Global Ministries Division in that her immediate supervisor was an Executive Administrative Asssistant. In conclusion, because McCallum's position was not "ministerial" in nature, and her discrimination claim is not barred as a result of the Church Autonomy Doctrine, subject matter jurisdiction exists. BGEA's motion to dismiss pursuant to Rule 12(b)(1) is denied.

---

[6] The court did not reach Rayburn's claim that she was not hired because she generally opposed practices made unlawful by Title VII.

Although the Court holds that Plaintiff was not in a ministerial role at BGEA, BGEA's substantive defense to McCallum's claim, is likely to pose the very type of entanglement issue that the Church Autonomy Doctrine and ministerial exception seek to avoid. In other words, the nature of McCallum's claims necessarily call into question BGEA's outreach decisions relevant to the Dare To Be A Daniel ministry. (*See* Section "B,1") BGEA's decision-making concerning the entity's overall mission, including how BGEA decides to go about implementing its outreach programs, falls squarely within the protections described in Rayburn. Rayburn teaches that a religious organization's rationale or support for its religious beliefs is off-limits notwithstanding Title VII's import. *See* Rayburn, 772 F.3d at 1169. "With respect to ""quintessentially religious" matters, the free exercise clause of the First Amendment protects *the act of a decision* rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." Rayburn, 772 F.3d at 1169 (*quoting* Milivojevich, 426 U.S. at 720) (*internal citation omitted*). The Rayburn panel explained, "[w]hile it is our duty to determine whether the position of associate in pastoral care is important to the spiritual mission of [the church], we may not then inquire whether the reason for [plaintiff's] rejection had some explicit grounding in theological belief." Id. Similarly, with respect to the threat of "excessive government entanglement," the Fourth Circuit noted that "the purpose of the church is fundamentally spiritual and the danger of "interaction between church and state," is what the establishment clause protects against." Rayburn, 772 F.2d at 1170 (*quoting* Lynch v. Donnelly, 465 U.S. 668 (1984)).

As a practical matter, the Court contemplates that as the case proceeds there will be certain doctrinal topics that will, in fact, remain "off-limits." *See e.g.*, Hopkins v. DeVeaux,

2011 WL 938298, *8 ("[A]lthough [the ministerial exception] might imply an absolute exception, it is not always a complete barrier to suit; for example a case may proceed if it involves a limited inquiry that, "combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters.") (*citations omitted*); *see also* Rayburn at 1165 (noting that the district court permitted limited discovery focused on the nature of the job at issue). Discovery concerning the facts surrounding Plaintiff's separation from BGEA will be allowed subject to BGEA's First Amendment rights. Discovery of matters relating to BGEA's internal governance and administration will be prohibited. As a result, BGEA cannot be required to explain its decision-making process with respect to its missions ministry (including global outreach generally; Dare To Be A Daniel Program). BGEA is not entirely shielded, however, from having to respond and provide any legitimate, non-discriminatory reason for the elimination of Plaintiff's position and subsequent separation from employment.

### B. Rule 12(b)(6) / Plaintiff's Claims Alleging Racial Discrimination Satisfy Twombly / Iqbal [4]

Absent direct evidence, the elements of a *prima facie* case of discrimination under Title

---

[4] McCallum's Title VII and § 1981 claims are analyzed as one. *See* Lightner v. City of Wilmington, 545 F.3d 260, 263 n.* (4th Cir.2008) ("[T]he *McDonnell Douglas* framework applies to discrimination claims under Title VII, § 1981, and § 1983.") (*citing* Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2004)). Similarly, McCallum's North Carolina state law claim alleging wrongful discharge in violation of public policy is also analyzed in conjunction with McCallum's Title VII claim given that the ultimate question under both theories is whether sufficient facts are alleged that give rise to a plausible claim of intentional discrimination. *See* N.C. GEN. STAT. §143-422.2; Amos v. Oakdale Knitting Co., 416 S.E.2d 166 (N. C.1992) ("at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes"). McCallum's state law claim alleging wrongful discharge in violation of public policy is based upon both racial discrimination and retaliation for McCallum's complaint of racism in the workplace. (Compl. ¶22)

VII are: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *See* Coleman v. Maryland Court of Appeals, 626 F.3d 187, 190 (4th Cir.2010) (*citing* White v. BFI Waste Servs., LLC, 375 F.3d 288, 295 (4th Cir.2004)).

McCallum alleges that BGEA discriminated against her based on race when it eliminated her position as a Global Ministries Administrative Assistant. There is no dispute concerning McCallum's membership in a protected class or that she was subject to an adverse employment action. In addition, Plaintiff alleges that her job performance was satisfactory and BGEA does not explicitly take issue with this proposition. The key here is whether McCallum has pled sufficient facts to satisfy the fourth criteria, namely, that she was treated differently from similarly situated employees outside the protected class.

In order to prevail on a disparate treatment claim based on race, a plaintiff may proceed by either the "pretext" or "mixed-motive" framework.[5] *See* Worden v. SunTrust Banks, Inc., 549 F.3d 334, 341 (4th Cir. 2008). Regardless of the framework used, and whether the plaintiff puts forth direct or circumstantial evidence, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the

---

[5] Both of these frameworks delve into the motivation of BGEA. Plaintiff must first establish a *prima facie* case of employment discrimination by producing evidence to fulfill four criteria related to the employment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the plaintiff provides credible evidence of all four criteria, there is a presumption of discrimination. At the second step, the burden shifts to the defendant to provide some legitimate nondiscriminatory reason for its employment decision. Id. If the employer provides a nondiscriminatory reason for its decision, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's proffered reason is pretextual. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The defendant is entitled to dismissal if the plaintiff fails to establish a *prima facie* case of discrimination or later fails to raise a material factual dispute concerning the employer's non-discriminatory reason for the alleged discriminatory act. Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995) (summary judgment context).

victim of intentional discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000).

Viewing the facts in the light most favorable to McCallum, the Court finds Plaintiff's claim of racial discrimination sufficiently plausible to go forward at this stage. Plaintiff alleges the following specific dates and events of disparate treatment by BGEA:

- McCallum was the single African-American employee working in BGEA's Executive Offices (Compl. ¶7)

- McCallum's job was the only job within Global Ministries to be eliminated as a result of BGEA's down-sizing (Compl. ¶21)

- A white project manager with no job duties was retained indefinitely as a BGEA employee pending creation of another position while McCallum was "down-sized" (Compl. ¶14)

- McCallum's separation and BGEA's subsequent hire of allegedly less-qualified white housekeeping employee for the Beresford Administrative Assistant position where McCallum was told less than two (2) months prior that the position might not be funded until the following year (Compl. ¶¶17-20)

All of the circumstances surrounding McCallum's separation from BGEA employment, particularly the temporal proximity of the relevant events, are potentially probative of McCallum's employment discrimination claim.

Defendant BGEA's motion to dismiss is denied as to this issue.

### C. Rule 12(b)(6) / Plaintiff's Retaliation Claim Does Not Satisfy <u>Twombly</u> / <u>Iqbal</u>[6]

Title VII also prohibits retaliation by a private employer against an employee because she "has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C.A. §2000e–3(a). The elements of a *prima facie* retaliation claim under Title VII are: (1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action. *See* <u>Coleman</u>, 626 F.3d at 190 (*citing* <u>Mackey v. Shalala</u>, 360 F.3d 463, 469 (4th Cir.2004)). Plaintiff's allegations establish the second and third criteria given the elimination of McCallum's position and the temporal proximity of that event to McCallum's decision to voice her concern at BGEA regarding potentially racially discriminatory practices within the Global Ministries Division. However, McCallum is unable to show that she engaged in a protected activity under Title VII.

Viewing the facts in the light most favorable to McCallum, McCallum is unable to show that she engaged in a protected activity. For purposes of Title VII, "[p]rotected activity includes opposing ***an unlawful employment practice*** or participating in any manner in a Title VII investigation, proceeding, or hearing." <u>Kubicko v. Ogden Logistics Services</u>, 181 F.3d 544, 551 (4th Cir.1999) (*emphasis provided*). "Unlawful employment practices" that an employee may oppose "include practices that discriminate against an individual with respect to [] compensation, terms, conditions, or privileges of employment." <u>Jordan v. Alternative Resources Corp.</u>, 458 F.3d 332, 339 (4th Cir.2006) (*internal quotation marks and citation omitted*).

---

[6] North Carolina law does not provide for a separate claim of retaliation. *See* <u>McLean v. Patten Communities, Inc.</u>, 332 F.3d 714, 719 (4th Cir.2003)) (no private right of action under North Carolina law for retaliation under NCEEPA, N.C. Gen. Stat. §143-422.2)

In this case, McCallum did not oppose an employment practice. Instead, McCallum alleged BGEA retaliated against her for questioning its evangelism and recruitment invitee list and attendant outreach ministry process – not retaliation for formal complaints concerning her own alleged discriminatory treatment within the workplace. "Title VII is not a general bad acts statute ... and it does not prohibit private employers from retaliating against an employee based on her opposition to discriminatory practices that are outside the scope of Title VII." Bonds v. Leavitt, 629 F.3d 369, 384 (4th Cir.2011) *(citing* Crowley v. Prince George's County, Md., 890 F.2d 683, 687 (4th Cir.1989)); *see also* Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (Title VII is not a "general civility code for the American workplace"). Indeed, Title VII is not intended to be a general whistleblower statute for redress of the panoply of wrongs that may occur in the workplace. *See e.g.,* Lightner v. City of Wilmington, 545 F.3d 260, 264 (4th Cir.2008) (explaining that plaintiff "has tried to take a statute aimed at discrete forms of discrimination and turn it into a general whistleblower statute, which of course Title VII is not.") As discussed at length, *infra*, disagreement over who or how a church decides to recruit to participate in its religious programs is a theological or spiritually pivotal matter for BGEA that is not subject to Title VII. *See e.g.*, Rayburn, 772 F.2d at 1168.

As far as the remaining facts alleged in support of both theories (*i.e.*, alleged acts of disparate treatment short of ultimate employment decision), McCallum never voiced any opposition while she was still employed at BGEA such that BGEA could retaliate. Therefore, to the extent Plaintiff contends BGEA retaliated against her in any other respect, Plaintiff did not oppose or participate in a Title VII investigation, proceeding, or hearing during the relevant time period.

Defendant BGEA's motion to dismiss Plaintiff's retaliation claim under Title VII is granted.

## IV. Order

**IT IS, THEREFORE, ORDERED THAT:**

1) Defendant BGEA's Motion to Dismiss is **DENIED** as the Church Autonomy Doctrine does not deprive the Court of subject matter jurisdiction, nor exempt BGEA from defending Plaintiff's employment discrimination claims pursuant to Title VII, Section 1981, and N.C. Gen. Stat. §143-422.2;

2) Defendant BGEA's Motion to Dismiss is **GRANTED** as to Plaintiff's claim of retaliation under Title VII;

3) The following causes of action alleged by Plaintiff McCallum remain: Plaintiff's causes of action alleging racial discrimination under Title VII [Second Claim For Relief] and Section 1981 [Third Claim For Relief]; as does Plaintiff's state law cause of action [First Claim For Relief] alleging discrimination based upon race and in retaliation for her complaint of racism in the workplace; and

4) Consistent with the terms of this Memorandum and Order, the scope of discovery will be subject to Defendant BGEA's First Amendment protections.

Signed: August 5, 2011

Richard L. Voorhees
United States District Judge