# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL DOCKET NO.: 3:09CV381-RLV

| | | |
|---|---|---|
| KIMBERLY MCCALLUM, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM and ORDER** |
| | ) | |
| BILLY GRAHAM | ) | |
| EVANGELISTIC ASSOCIATION, | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Defendant Billy Graham Evangelistic Association's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, Motion for Summary Judgment (Doc. 21), filed June 15, 2012; Plaintiff Kimberly McCallum's Response in Opposition to Defendant's Motion for Summary Judgment and Motion to Dismiss (Doc. 24), filed July 16, 2011; and Defendant's Reply in Support of the Motion for Summary Judgment (Doc. 25), filed July 26, 2012. This matter is ripe for disposition.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In October 2003, Plaintiff Kimberly McCallum ("McCallum") commenced an at-will employment relationship with Defendant Billy Graham Evangelistic Association ("BGEA"), a non-profit corporation dedicated to delivering the message of Jesus Christ. (Compl., ¶¶4–5; Plaintiff Dep., 24:17-22, 25:1-9, 25:17-21, 37:21-23; Campbell Decl., ¶ 4.) Serving as a Resource Correspondent for the Christian Guidance Department, McCallum reviewed incoming letters and formulated responses to spread BGEA's spiritual message until 2007. (Plaintiff Dep., 24:17-22, 25:1-9, 25:22-26:3.)

In late 2006, McCallum became acquainted with Sean Campbell ("Campbell"), a BGEA Vice President, when she inquired about missions work. (Campbell Decl., ¶¶ 5, 6, 8; Plaintiff Dep., 31.) McCallum expressed an interest in BGEA's work in south Sudan as well as short-term mission opportunities for employees. (Plaintiff Dep., 30-31; Campbell Decl., ¶ 6)

In February 2007, Campbell assumed dual roles for BGEA, namely, serving as both Senior Vice President of Ministry and Vice President of Global Offices (or Global Ministries) for BGEA and Samaritan's Purse.[1] (Campbell Decl., ¶¶ 3, 5, 10.) Shortly thereafter, Campbell, who had been impressed with McCallum, offered McCallum a new Administrative Assistant Position created "to both split and support the administrative functions" for Campbell's dual positions.[2] (Campbell Decl., ¶¶ 8, 11.) Consequently, McCallum would report directly to Campbell's Executive Assistant, Cindy Owen ("Owen"). (Campbell Decl., ¶ 8; Plaintiff Dep., 40.)

Although Campbell believed his new Global Ministries duties and dual roles necessitated additional administrative support, he quickly realized that Plaintiff did not have enough work to perform. (Campbell Decl., ¶ 11.). According to Campbell, Owen was "able to handle the increase in . . . workload, such that McCallum was not fully engaged." (Campbell Decl., ¶ 12.) McCallum testified that her workload was "extremely light" when she worked for Campbell. (Plaintiff Dep., 41:16-18, 43:3-7.) McCallum admitted that she would sit at her desk for unreasonable periods of time with no work to complete. (Plaintiff Dep., 41:16-18, 43:3-7.) As a

---

[1] Campbell's new dual role "coincided with BGEA's efforts to reorganize its ministries to align them with the separate ministries led by Reverend Graham's son, Franklin, with Samaritan's Purse in Boone, North Carolina." (Campbell Decl., ¶5)

[2] During Plaintiff's tenure with Campbell, McCallum was the only African-American working in BGEA's executive offices. (Compl., ¶ 7.)

2

short-term measure, McCallum was asked to assist other BGEA departments. (Campbell Decl., ¶ 13.)

One of McCallum's temporary assignments was to assist with a summer camp component of the Dare to Be a Daniel Project.[3] (Campbell Decl., ¶ 13; Plaintiff Dep., 45:11-13, 46:2-10.) While McCallum worked on this project, McCallum claims she was privy to information suggesting BGEA harbored racial bias against African-American churches.[4] (Plaintiff Dep., 104:16-105:8.) McCallum shared her concern with Campbell and Mr. Robert Hill ("Hill"), a BGEA executive who worked closely with Mr. Franklin Graham. (Compl. ¶11) When McCallum spoke with Hill, Hill advised he would "look into the matter and get back to her within two weeks." (Compl. ¶12)

During the summer of 2007, Campbell "discussed with upper management at BGEA the need to reassign some of his job duties, in particular those related to his Vice President of Global Offices role, so that [he] could better focus [his] time and attention in other areas." (Campbell Decl., ¶ 14.) Campbell effectively resigned his position as Vice President of Global Offices /

---

[3] BGEA's "Dare To Be A Daniel" program consists of an evangelism training course for children ages 9 through 14. *See* "http://billygraham.org/d2bd_index.asp."

[4] As set out in the Court's August 5, 2011 Memorandum and Order:

McCallum was required to contact churches that BGEA routinely invited to its Crusades and other BGEA events to recruit campers to fill vacancies in the program. (Compl. ¶9) During her work on this project, McCallum observed that only three (3) of the 635 churches identified as regular BGEA invitees were primarily African-American congregations. (Compl. ¶10) McCallum claims that black churches located on the same streets as white churches on the BGEA list of invitees were excluded, "as if the compiler had deliberately skipped over the black congregations." (Compl. ¶10) McCallum became concerned that BGEA was intentionally inviting only white people to its events. (Compl. ¶10)

(M & O, 2.)

3

Ministries.  (Campbell Decl., ¶ 14; Plaintiff Dep., 52:19-23.)

Approximately 7 months after accepting the position with Campbell, and approximately one week after McCallum shared her concern with Campbell and Hill that BGEA was discriminating against African-American churches, McCallum was advised that her position as an Administrative Assistant would be eliminated due to "downsizing." (Plaintiff Dep., 52; Campbell Decl., ¶ 15.)   By that time, on or around July 2007, Campbell had concluded that his workload would not justify employing two assistants.  (Campbell Decl., ¶ 14.)  Campbell made the decision to terminate McCallum and retain Owen. (Campbell Decl., ¶19)   Campbell met with McCallum and explained that certain of his responsibilities as Vice President of Global Offices were going to be reassigned and that his workload would not (and did not) support two assistants.  (Campbell Decl., ¶ 15.)  McCallum remained on payroll for another thirty (30) days and received  3 weeks severance pay upon separation from BGEA.  (Campbell Decl., ¶  ) The second Administrative Assistant Position (*i.e.*, McCallum's position) was never reinstated. (Campbell Decl., ¶ 20; Plaintiff Dep., 56:14-19.)

After being notified about the elimination of her position, McCallum was encouraged to work with Maxine Rybak ("Rybak"), BGEA's Senior Recruiter-Community Relations, to find alternative employment within BGEA. (Plaintiff Dep., 51:7-52:15; Campbell Decl., ¶ 16.) McCallum met with Rybak on August 3, 2007, and expressed interest in other Administrative or Executive Assistant Positions.[5] (Plaintiff Dep., 61:14-19.)

_____

[5] At that time, the only position available was an Administrative Coordinator Position in the Grayson Publishing Department, which was the BGEA Bookstore.  (Plaintiff Dep., 61-62 / Pl.'s Exh. 8.) McCallum advised Ryback that, in her opinion, the Administrative Coordinator Position in Grayson would not best utilize her skill set. (Id.)  McCallum understood the position to involve order filling in a warehouse.  (Plaintiff Dep., 62.)  McCallum never requested a job description and was never made aware of the salary range for the Grayson job.  (Plaintiff Dep., 62-63.)  McCallum elected not to apply and

4

On August 16, 2007, Rybak invited McCallum to interview for a potential position as an Administrative Assistant for Michael Beresford ("Beresford"), then Managing Director for Church Ministries.[6] (Plaintiff Dep., 67:17-25, Exh. 14; Beresford Dep., 6.) Rybak explained that this position had not been approved or funded at the time of McCallum's interview, and that the interview was simply a preliminary step to gauge Plaintiff's interest and fit. (Plaintiff Dep., 68:1-7, Exh. 14; Rybak Dep., 34:23-35:4.) Furthermore, Rybak told McCallum that if the new position was approved, the job would have to be posted internally to give other interested employees an opportunity to apply and interview. (Plaintiff Dep., 68:8-13, Exh. 14.) While McCallum was aware that the position had not yet been funded, she knew that Campbell possessed significant control over the department's budget.[7] (Exh. 4 / Plaintiff Decl., ¶3)

Rybak attended the preliminary interview and, according to Plaintiff, Rybak tried to convince McCallum that she was not the right person for the job. (Plaintiff Dep., 68:20-23.) According to McCallum, after Rybak left the interview, Beresford offered her the job (to begin upon approval and funding) and she responded favorably. (Plaintiff Dep., 69:2-6.) McCallum admits that salary was not discussed. (Plaintiff Dep., 69:17-20.) Beresford recalls that he could not have possibly offered McCallum the job at that time because it had not been approved or funded. (Beresford Dep., 42:25-43:2, 43:9-16.)

indicated her intention to continue to check the Internet for updated job postings. (Plaintiff Dep., 62.)

[6] McCallum had assisted Beresford on a temporary, part-time basis as a result of the lack of work from Campbell and Beresford's desire to have BGEA fund a full-time Administrative Assistant Position to support him. (Beresford Dep., 54.)

[7] Beresford's immediate supervisor reported to Campbell. (Plaintiff Decl., ¶ 3)

5

McCallum also applied for an Administrative Assistant Position supporting BGEA's Director of Communications, Kathy Yokeley ("Yokeley"). (Plaintiff Dep., 63:9-21, Yokeley Decl. ¶¶ 3, 12.) This was also a newly created position. (Yokeley Decl., ¶¶ 4-8.) However, unlike the potential Beresford position, the Yokeley position had been approved and funded.[8] (Yokeley Decl., ¶¶ 8-10.) Yokeley selected McCallum for an interview but during the course of the interview Yokeley advised McCallum that due to the nature of the position, she was looking for someone with a Bachelor's Degree. (Plaintiff Decl., ¶ 5.) Plaintiff, who did not possess a Bachelor's Degree, did not meet that qualification. (Plaintiff Dep., 64.)

Yokeley and McCallum describe the interview experience, and events preceding the actual interview, differently. According to Yokeley, McCallum arrived twenty-minutes late for the interview and did not inform Yokeley of the delay. (Yokeley Decl., ¶ 13; Rybak Dep., 56:12-17, 57:10-15.) McCallum, however, claims that she called Yokeley prior to the interview, requested a twenty minute delay, and arrived on time for the rescheduled interview. (Plaintiff Decl., ¶ 4.) According to McCallum, she needed to delay the interview time so that she could complete an assignment in Global Offices. (Plaintiff Decl., ¶ 4.)

It is Yokeley's recollection that McCallum discussed utilizing her skills to improve public relations during the interview. According to Yokeley, this was problematic because she wanted an employee for administrative work, not public relations. (Yokeley Decl., ¶ 16.)

---

[8] The Yokeley position was "unbudgeted", which simply means that the position was so new that it had not been included in the prior year's budgeting process. (Yokeley Decl., ¶ 9.) Plaintiff complains that BGEA's approach with respect to hiring for the Yokeley and Beresford positions was inconsistent and supports her argument that BGEA's explanations are pretextual. The undisputed evidence is that the Yokeley position, although unbudgeted, was approved, funded, and eligible for being filled immediately following the interview process. (Yokeley Decl., ¶¶ 8, 10.) The same cannot be said for the Beresford position. For this reason, the Court concludes that there is nothing suspect about Yokeley's ability to hire for this position as compared to (or contrasted with) the Beresford position.

McCallum disputes Yokeley's account and contends that she never discussed the subject of public relations. (Plaintiff Decl., ¶ 5.) Regardless, during the interview, McCallum concluded that she was not actually qualified for the job because she did not have a Bachelors Degree. (Plaintiff Decl., ¶ 5; Plaintiff Dep., 64:1-3.)  In fact, Yokeley hired an external candidate, Megan Wagenhauser ("Wagenhauser"), who had her Bachelors Degree and administrative experience. (Yokeley Decl., ¶¶ 19, 20, 22.)

Finally, on August 28, 2007, McCallum notified Rybak that she would be dropping off an Expression of Interest Form for a Proofreader Position. (Plaintiff Dep., 64:15-24 / Exh. 13.) Rybak informed McCallum that the hiring manager for that position was either prepared to make an offer to another candidate, or was in the process of extending an offer. (Plaintiff Dep., 65:11-15.)  According to McCallum, Rybak refused to forward McCallum's form to the appropriate hiring officer even though the job was still listed on the BGEA Intranet site as available and remained "open" for another several days.  (Plaintiff Decl., ¶ 10.)  Ryback claims that when she shared with McCallum that a candidate had already been chosen, McCallum got irritated and took her interest form and left.  (Ryback Dep.,   .)  McCallum's last day at BGEA was August 31, 2007.

Beresford's Administrative Assistant Position was eventually funded and approved, effective October 10, 2007 – approximately 5 weeks after McCallum's separation. (Beresford Dep., 46:8-10, 49:1-4.)  Following the creation of this position, the job was posted internally and 5 to 6  existing BGEA employees applied. (Beresford Dep., 46:17-20, 49:10-50:15.)   Beresford interviewed all of the internal applicants and testified that it was BGEA policy to hire from

7

within.[9] (Beresford Dep., 46:19-20.) (Beresford testified that he was intructed to hire from within.) Because McCallum's employment terminated August 31, 2007, Plaintiff was unable to apply for the Beresford position as an internal candidate. Beresford did not have any discussions with Ryback (or McCallum) about whether McCallum would be in the pool of potential applicants. (Beresford Dep., 49:5-9.) Beresford ultimately selected Beth Timmons ("Timmons"), a Caucasian woman from the Facilities (Housekeeping) Division of BGEA, for the position. (Beresford Dep., 46:15-20, 50:9-17.)

McCallum contends that the elimination of her Global Ministries position, as well as her inability to secure other employment within BGEA prior to separation, was orchestrated because of her race and because she complained about what she perceived to be discriminatory conduct on the part of BGEA. (Plaintiff Dep., 104:16-105:8.) More specifically, Plaintiff asserts that (1) she was the only African-American employee working in BGEA's executive offices when she worked with Campbell; (2) her job was eliminated while Owen, a white employee, retained her position as Campbell's Executive Administrative Assistant, (3) she was offered a job as Beresford's Administrative Assistant, which was later rescinded and given to a less qualified white employee, (4) Plaintiff was passed over for the Yokeley Administrative Assistant Position in favor of a white employee; and (5) Rybak prevented Plaintiff from being formally considered for a Proofreader Position.

McCallum submitted a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and filed suit within ninety days of receiving her right-to-

---

[9] Rybak did not attend these interviews. (Beresford Dep., 55:14-16.)

sue letter.[10]  (Compl., ¶ 25.)

On June 22, 2009, Plaintiff commenced this action in the Superior Court of Mecklenburg County, North Carolina, alleging that Defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and North Carolina Public Policy (N.C. GEN. STAT. §§ 143-422.1 *et seq*). Defendant removed the case to federal court on September 2, 2009, pursuant to 28 U.S.C. §§1441 and 1446.

On September 9, 2009, Defendant filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  In response to the jurisdictional challenge, the undersigned determined that Plaintiff's claim of racial discrimination was not precluded by the First Amendment.  (M & O, 10.)  The Court dismissed Plaintiff's retaliation claim but denied Defendant's Motion to Dismiss for all other claims. (Doc. 10)  For purposes of Rule 12(b)(6), the undersigned found that McCallum pled sufficiently plausible facts in support of her claim that she was "treated differently from similarly situated employees outside the protected class." (M & O, 13.)  Discovery was undertaken, subject to certain limitations, and has since been completed.

Defendant now renews its Motion to Dismiss pursuant to Rule 12(b)(1) and, as an alternative, moves for Summary Judgment on all of Plaintiff's causes of action pursuant to Rule 56.

## II.  RENEWED RULE 12(b)(1) MOTION

### A.  Standard

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a case where the court

---

[10]  As previously noted, McCallum satisfied the exhaustion of administrative remedies and / or jurisdictional requirements for purposes of her Title VII claim.  (M & O, 4 n. 3.)

lacks subject matter jurisdiction over the lawsuit. *Wilkins v. Gaddy*, 2012 WL 2917887, at *1 (W.D.N.C. July 17, 2012). When evaluating a motion to dismiss based on Rule 12(b)(1), the Court must construe the complaint broadly and need not draw inferences in favor of the plaintiff. *Smith v. Raleigh Dist. of N.C. Conference of United Methodist Church*, 63 F. Supp. 2d 694, 699 (E.D.N.C. 1999). When a defendant presents a challenge to the court's subject matter jurisdiction, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Richmond, Fredericksburg & Potomac Railroad Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991). All material jurisdictional facts must not be in dispute for the court to consider granting a 12(b)(1) motion. *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999).

### B. Discussion

In its renewed Rule 12(b)(1) challenge, BGEA alleges that the Church Autonomy Doctrine deprives this Court of subject matter jurisdiction.[11]

Grounded in First Amendment jurisprudence, the Church Autonomy Doctrine relies on the principle that churches have the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *See Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1166-67 (4th Cir.1985) (construing Title VII's statutory exemption for religious institutions narrowly to preclude a Title VII action for employment decisions *based upon religious preferences* but not decisions based

---

[11] The ministerial exception issue has also been addressed pursuant to Rule 12(b)(6). *See e.g.*, *Smith*, 63 F.Supp. 2d at 699; *Hopkins v. DeVeaux*, 2011 WL 938298 (N.D.Ga. March 16, 2011).

10

on race, sex, or national origin) (internal citation omitted).[12]  As more recently explained by the Supreme Court, the First Amendment's Free Exercise Clause and Establishment Clause both "bar the government from interfering with the decision of a religious group to fire one of its ministers."  *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 132 S.Ct. 694, 702 (2012)  (detailing historical bases for First Amendment jurisprudence).  That is not the issue presented here.

In its August 2011 Memorandum and Order, this Court held that the ministerial exception, which application would bar consideration of Plaintiff's claims in their entirety, does not apply since McCallum's duties were not considered "important to the spiritual and pastoral mission of the church" and did not involve matters of church governance. *See McCallum v. Billy Graham Evangelistic Ass'n*, 824 F. Supp. 2d 644 (W.D.N.C. Aug. 5, 2011) (hereinafter "M & O"); *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985); *Hosanna-Tabor Evangelical Lutheran Church and School,* 132 S.Ct. at 705-07 (recognizing ministerial exception as a bar to Title VII and other employment discrimination laws).  The Court likewise found that adjudication of Plaintiff's disparate treatment claims would not necessarily create excessive entanglement prohibited by the First Amendment.  While

---

[12] Title VII prohibits employers from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ." 42 U.S.C.A. § 2000e–2(a)(1).  Title VII  exempts certain employment decisions of religious organizations:

> This subchapter shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. §2000e-1 (1982).

11

the Court recognized that Plaintiff's cause of action, and BGEA's defense thereof, would require

BGEA to provide its reasons for the challenged employment decisions, the undersigned stated:

> []BGEA's decision-making concerning the entity's overall mission, including how BGEA decides to go about implementing its outreach programs, falls squarely within the protections described in Rayburn. Rayburn teaches that a religious organization's rationale or support for its religious beliefs is off-limits notwithstanding Title VII's import. *See* Rayburn, 772 F.3d at 1169. "With respect to ""quintessentially religious" matters, the free exercise clause of the First Amendment protects *the act of a decision* rather than a motivation behind it. In these sensitive areas, the state may no more require a minimum basis in doctrinal reasoning than it may supervise doctrinal content." Rayburn, 772 F.3d at 1169 (*quoting* Milivojevich, 426 U.S. at 720) (*internal citation omitted*).

> \*\*\*

> As a result, BGEA cannot be required to explain its decision-making process with respect to its missions ministry (including global outreach generally; Dare To Be A Daniel Program). BGEA is not entirely shielded, however, from having to respond and provide any legitimate, non-discriminatory reason for the elimination of Plaintiff's position and subsequent separation from employment."

(M & O, 12.) Thus, in the event of a jury trial, all evidence relating to global outreach and the

Dare To Be A Daniel Program would be deemed inadmissible so as not to "collide" with the

First Amendment.[13]

Religion plays a minimal to non-existent role in the analysis of McCallum's remaining

disparate treatment claim.[14] While McCallum mentions the Dare To Be A Daniel Program and

her questioning of BGEA's outreach efforts, McCallum's Title VII claim relies heavily upon

---

[13] To the extent Plaintiff argues that BGEA's response to her complaint (*i.e.*, "skipping over" African American churches as it recruited for its Dare To Be A Daniel summer camp) is probative of BGEA's motives relative to her disparate treatment claim, the Court views the issue as an evidentiary matter. While the fact that McCallum complained to a supervisor or officer of BGEA about an alleged discriminatory practice may have some probative value, any details concerning the nature of her complaint would be inadmissible in light of the First Amendment.

[14] Plaintiff's retaliation claim presented more of an entanglement concern since retaliation by BGEA was allegedly directly attributable to Plaintiff's exposure and complaints regarding racially discriminatory decision-making in connection with BGEA's outreach efforts.

non-religious motives.   Plaintiff's Complaint alleges racial discrimination – not religious discrimination.  (Plaintiff's Brf. In Opp'n, 18.) (describing McCallum's claims as "straightforward race discrimination claims.")   More importantly, Plaintiff does not contend that BGEA employed discriminatory practices in its ministry.  McCallum clarifies that, given the theology of Dr. Graham, she "would never assert that [BGEA] was discriminating against African American churches."  (*Id.*, 19.)  The Court finds there is little to no risk of excessive entanglement under the First Amendment.

For these reasons, Defendant's renewed Rule 12(b)(1) motion is <u>denied</u>.

### III.  SUMMARY JUDGMENT

#### A.  Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted when there is "no genuine dispute as to any material fact" and judgment may be given as a matter of law. A fact is material when it creates substantial doubt as to the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 248 (1986); *see David v. Alphin*, 817 F. Supp. 2d 764 (W.D.N.C. 2011). To determine what constitutes a material fact, the court must examine substantive law, and may look at the pleadings, discovery, affidavits, and disclosure material on file. *Anderson*, 447 U.S. at 248; *Sinclair v. Mobile 360 Inc.,* 417 Fed. Appx. 235, 241 (4th Cir. 2011). The moving party possesses the burden of production, and all inferences must be drawn in favor of the non-moving party. *Provident Life & Accident Ins. Co. v. Sanders,* 2011 WL 1239816, at *1 (W.D.N.C. Oct. 25, 2011); *Miltier v. Beorn*, 896 F.2d 848 (4th Cir. 1990).

In opposing a Motion for Summary Judgment, the non-moving party may not "rest upon the mere allegations or denials of [her] pleadings." Fed. R. Civ. P. 56(e). The non-moving party must instead "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.

13

P. 56(e). This requires the party to reference and cite materials in the record. *Sanders*, 2011 WL 1239816, at *1. Thus, a successful motion for summary judgment demonstrates (1) that there are no material issues of fact, and (2) that the party is entitled to judgment as a matter of law.

### B. Discussion

Defendant BGEA moves for summary judgment on the grounds that McCallum fails to state a *prima facie* case of discrimination and, that even if such a case had been stated, Plaintiff fails to demonstrate that Defendant's non-discriminatory explanation was a mere pretext for racial discrimination. Having considered Plaintiff's claims in light of the record, and taking the evidence in the light most favorable to Plaintiff, this Court concludes that Plaintiff has not produced sufficient evidence to withstand Defendant's summary judgment motion.

Plaintiff's federal and state causes of action effectively merge into one claim of race discrimination. *See Love-Lane v. Martin*, 355 F.3d 766, 786 (4th Cir.2004) (elements required to establish Section 1981 claim and Title VII claim are the same); *Anderson v. Duke Energy Corp.*, 2008 WL 4596238, *14 (October 14, 2008 W.D.N.C.) (analyzing wrongful discharge claim pursuant to N.C. GEN. STAT. §143-422.1 in the same manner, and subject to the same evidentiary standards, as Title VII claim given that underlying policies for both are identical) (unpublished) (internal citations omitted). Because the standard of proof is the same on all three claims, this Memorandum and Order will address Plaintiff's remaining claims collectively within the framework of Title VII.

A Title VII plaintiff may establish a claim of intentional discrimination sufficient to avoid summary judgment in one of two ways: (1) a mixed-motive framework, or (2) the *McDonnell Douglas* pretext framework. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir.2004) (en banc); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

14

802–05 (1973). Under a mixed-motive analysis, the employee does not have to demonstrate that the prohibited discrimination was the sole motivating factor to prevail, so long as it was a motivating factor.[15] *Hill,* 354 F.3d at 284. Under the *McDonnell Douglas* pretext framework, Plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *See Brown v. McLean,* 159 F.3d 898, 904–05 (4th Cir. 1998); *Adams v. Trustees of the Univ. of N.C.-Wilmington,* 640 F.3d 550, 558 (4th Cir. 2011).

In order to make a *prima facie* showing of disparate treatment, McCallum must demonstrate that: "(1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class." *Hill*, 354 F.3d at 285. In the context of a reduction in force, the fourth criteria may also be met "by introducing other probative evidence that indicates the employer did not treat age and race neutrally when making its decision." *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998). If the Plaintiff makes this showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. If the employer does so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reasons are a pretext for unlawful discrimination. *Id.*

In this context, the term "pretext" means "deceit designed to hide unlawful discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).

---

[15] Under The Civil Rights Act of 1991 ("1991 Act"), "liability is established once the employee proves that a protected trait was a motivating factor for the employer's decision . . . ." *EEOC v. Warfield-Rohr Casket Co., Inc.*, 364 F. 3d 160, 164 n. 2 (4th Cir.2004); 42 U.S.C.A. §2000e-2(m).

15

Evidence of pretext must consist of more than conclusory or self-serving statements of the plaintiff-employee to survive summary judgment. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (plaintiff's affidavit "mostly made up of conclusory statements . . . without more is not enough to establish a *prima facie* case of discrimination"). With respect to showing falsity of the employer's explanation (*i.e.*, pretext), summary judgment depends on "the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, [and] any other evidence that supports the employer's case and that properly may be considered . . . ." *Pledger v. Mayview Convalescent Home, Inc.*, 2009 WL 1010428, *8 (April 14, 2009 E.D.N.C.) (quoting *Reeves*, 530 U.S. at 148-49). The ultimate burden of persuasion remains on the Plaintiff at all times. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Hill*, at 286 (quoting *Reeves*, 530 U.S. at 153.)

Here, Plaintiff has shown that, as an African American, she is a member of a protected class and that she suffered an adverse employment action because her BGEA position was eliminated. The record likewise reveals that prior to Plaintiff's termination, Plaintiff's work product was satisfactory.[16] Thus, the issue for the Court stems from the fourth *prima facie* inquiry, namely, whether McCallum can show "that she was treated differently from similarly

---

[16] BGEA advances no serious argument that McCallum's work fell below the "satisfactory" mark. Even so, BGEA stated in its EEOC Response:

"[I]n addition to various performance issues that Dr. Campbell began to experience with respect to McCallum's work (which were essentially echoes of concerns noted in her previous reviews), Dr. Campbell and Ms. Owen began to receive anecdotal feedback from several groups with whom Ms. McCallum interacted regarding her abrupt tone, feedback from several groups with whom Ms. McCallum."

(Pl.'s Exh. 8.)

16

situated employees outside the protected class." (M & O, ¶ 13.)  More particularly, the Court contemplates whether Plaintiff produces sufficient evidence from which a jury could reasonably find either that BGEA's non-discriminatory explanation constitutes  pretext or that race was a motivating factor in the employment decisions being challenged.

In short, Plaintiff's claims of racial discrimination are not borne out by the evidence.

### 1. BGEA's Decision To Eliminate Campbell's Second Administrative Assistant Position / McCallum's Position[17]

Plaintiff acknowledges that her Global Ministries Administrative Assistant Position under Campbell did not remain open and was never filled by an applicant outside of the protected class following her displacement.  (Plaintiff Dep., 56:14-19; Campbell Decl., ¶20.)  Nonetheless, because McCallum's termination was arguably more akin to a reduction in force, McCallum can introduce "other probative evidence that indicates the employer did not treat [] race neutrally when making the decision." *Causey*, 162 F.3d at 802 ("Because [plaintiff] was terminated as part of a reduction in force, he could potentially satisfy the fourth element of a *prima facie* case by introducing other probative evidence that indicates the employer did not treat age and race neutrally when making its decision.")

Plaintiff fails to demonstrate that BGEA did not treat race neutrally when deciding to eliminate her Global Ministries position.  According to BGEA, the elimination of Plaintiff's position was based *solely* upon the lack of administrative work in Campbell's office to support two assistants.  It is undisputed that Campbell did not require two administrative assistants. (Plaintiff Dep., 52:19-23; Campbell Decl., ¶ 14.)  As Owen was the Senior Administrative

---

[17] BGEA suggests in its reply brief that Plaintiff has since abandoned this claim.  Because Plaintiff McCallum does not expressly do so, the Court will address the issue.

17

Assistant and Plaintiff reported to Owen, Campbell decided to retain the more experienced Owen and terminate Plaintiff. (Campbell Decl., ¶ 19.) Campbell declares that once he was convinced that his workload did not justify two assistants, he "had no alternative but to eliminate her[McCallum's] position." (Campbell Decl., ¶ 15.) McCallum has since conceded that she has no reason to believe Campbell lied or misrepresented the reason for her termination. (Plaintiff Dep., 55:16-19.) The record amply supports BGEA's legitimate, non-discriminatory explanation.

Moreover, there is *no* evidence of pretext. Campbell personally made the decision to both hire and terminate McCallum. (Campbell Decl., ¶ 19.) McCallum concedes that Campbell did not discriminate against her based upon her race. (Plaintiff Dep., 98:6-8.) Even absent McCallum's concession, "employers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (holding that where an employer hired and fired an employee within a six-month time frame, any "inference of discriminatory animus [was] unwarranted"). Because Campbell both initiated and terminated Plaintiff's employment, a presumption against an improper discriminatory motive is applicable. *Id.* at 797–98.

For all of these reasons, Plaintiff's racial discrimination claim with respect to the elimination of her Global Ministries position must be dismissed.

## 2. Inability To Secure Other Employment Within BGEA

Turning next to Plaintiff's inability to secure another BGEA position, McCallum fails to state a *prima facie* case of discrimination as to any of the challenged employment decisions. In each instance, McCallum is either unable to show 1) that the person chosen by BGEA for the position is less qualified; or 2) that McCallum was similarly situated to the person ultimately hired. Furthermore, even if Plaintiff could state a *prima facie* case, she provides insufficient

18

evidence from which a reasonable juror could find that Defendant's legitimate, non-discriminatory reasons were pretext. Plaintiff's only evidence in support of her disparate treatment claim is that white applicants were hired for positions she applied for. At best, Plaintiff makes general statements of dissimilar treatment, each lacking specifics and detail.

The Court briefly evaluates each position in turn.

**a. The Beresford Administrative Assistant Position**

Plaintiff contends that the Beresford Administrative Assistant Position was offered to a less qualified white applicant from the Facilities (Housekeeping) Division after she was advised that the position would not be funded until the following year. Plaintiff argues that Plaintiff was more qualified than the person selected for the position, Beth Timmons. Following discovery, the record reveals that Timmons had previously worked as an Administrative Assistant, had an Associate's Degree, and prior work experience managing a sales team at AT&T. (Beresford Dep., 51:4-7, 51:16-20, 62:16-23.) Timmons, who was apparently overqualified for her work in the Facilities Division, had ended up there amidst a personal crisis (*i.e.*, the "degradation of her marriage"). (Beresford Dep., 63:24-25.) Timmons knew how to operate all of the necessary systems but took refresher courses on her own time to update her knowledge of more recent versions of Microsoft Word and Excel. (Beresford Dep., 51:8-15; Plaintiff Dep., 82:4-8.) Timmons' initiative in brushing up on her administrative skills does not mean she was any less qualified for the job than McCallum. Even so, assuming that these facts are sufficient to show that Timmons and McCallum were similarly qualified, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for its failure to hire Plaintiff.

The burden on the defendant is one of production, meaning that the defendant need not persuade the court by a preponderance of the evidence that it was motivated by the reason(s)

19

articulated. *Monroe v. Burlington Indus., Inc.*, 784 F.2d 568, 571 (4th Cir. 1986); *Causey*, 162 F.3d at 800; *Hughes v. Bedsole*, 48 F.3d 1376, 1384 (4th Cir. 1995). Defendant explains that because the position had not been approved or funded – and did not exist – Beresford did not have a job to offer McCallum prior to her separation from BGEA. (Beresford Dep., 42:25-43:2, 43:9-16.) BGEA explains further that Plaintiff was not an internal employee at the time the Beresford position was posted for hire.[18] Consequently, Plaintiff was ineligible to be considered at the outset of the hiring process (which favored the internal candidate). Thus, the Court finds that Defendant has successfully articulated a legitimate, non-discriminatory reason with respect to the Beresford position.

Given that Defendant has satisfied its burden of production, the burden shifts back to Plaintiff to show "by a preponderance of the evidence, that the proffered reason was [a] pretext for discrimination." *Causey*, 162 F.3d at 800. This burden on the Plaintiff can be met by showing that the nondiscriminatory explanation is unworthy of credence. *Monroe*, 784 F.2d at 572. McCallum questions Ryback's involvement since she had never been referred to Ryback for assistance in connection with previous moves within BGEA. McCallum implies that the Rybak referral is attributable to her complaint to Campbell and Hill. (Plaintiff Dep., 87:8-22.). However, it appears more likely (at least equally likely) that Ryback sought to help McCallum, particularly since there is no evidence that McCallum, a four-plus year BGEA employee, had ever been displaced from another BGEA position in this manner. Ryback explained her purpose in being physically present for a portion of Plaintiff's interview with Beresford, namely, to ensure that Beresford and McCallum understood that the Beresford Position had only been

---

[18] In *prima facie* terms, McCallum and Timmons were not similarly situated or similarly qualified at that point.

"projected," and may or may not be approved and funded as a full-time position at some point during 2008. (Ryback Dep., 38.) Ryback testified,

> "I do remember having conversations with Sean[Campbell] being very concerned about the fact that he had brought Kim[Plaintiff] onto his team, and that after having brought her onto his team his responsibilities were changing again, and that the workload was not quite as much as he thought it would be."

(Ryback Dep., 11-12.) Thus, it appears there was a general concern that Campbell, who did not follow prescribed hiring protocol when he sought McCallum out for his new position, had recruited McCallum just a short time prior only to discover that his workload did not justify the second position. Indeed, according to Beresford – whose overall recollection and memory of the events is less than vivid – testified that he *did* remember that "Ms. Ryback was very keen on finding Kim[Plaintiff] a position." (Beresford Dep., 43:1-2.) There is simply nothing about Ryback's involvement with McCallum following the news of her impending displacement that could lead a reasonable juror to conclude that BGEA acted with a discriminatory motive.

Plaintiff also claims that she was offered the Beresford position the day of her "interview" but that the offer was subsequently rescinded. BGEA posits that it would not have been possible to offer McCallum the job at that point. The record, including Plaintiff's own testimony, undermines Plaintiff's contention that she had in fact been offered the job by Beresford, or that Beresford had extended her a provisional offer. Indeed, Plaintiff admits that she was aware that the job had not been approved or funded. (Plaintiff Dep., 68:1-7, Ex. 14.) McCallum was told (unequivocally) that the Beresford position was an opportunity that could develop in the future. Plaintiff further admits she was informed that once the position became available, it would be posted internally to give other interested employees an opportunity to

Case 3:09-cv-00381-RLV-DCK   Document 30   Filed 10/05/12   Page 21 of 30

apply and interview. (Plaintiff Dep., 68:8-13, Ex. 14.) In light of this undisputed evidence,

Plaintiff's self-serving claim does not create a material factual dispute.

Plaintiff finally argues that BGEA's EEOC Response, what amounts to a preliminary

position statement by BGEA,[19] is evidence of pretext given that Beresford testified that he did

not learn of the EEOC charge submitted by McCallum until 2009. (Beresford Dep., 60:8-16.)

*See* Section "III., C." McCallum contends that *if* Beresford was not made aware of the EEOC

complaint until 2009, Beresford could not have provided any justification for his ultimate hiring

decision. Plaintiff relies on the following testimony from Beresford:

> Q: Now, did anyone come to you in the fall of '07 or in '08 to inform you that
> Ms. McCallum had filed a charge with the EEOC, Equal Employment
> Opportunity Commission?
>
> A: I don't *believe* I was aware of that until I got the first letter saying if there was
> any correspondence or e-mails, please retain them. Which I don't *believe* was
> that soon. I *believe* that was in '09.
>
> Q: Did anyone come to you . . . [or] approach you before '09 to discuss with you
> the circumstances regarding Ms. McCallum performing duties for you for about
> five weeks and then being gone?
>
> A: No.
>
> Q: So you never told anyone in the fall of '07 that you would not have considered
> Ms. McCallum for that position even if it were approved?
>
> A: That I had not considered her?
>
> Q: Right.
>
> A: I would have always interviewed Kim.

---

[19] BGEA's EEOC Response notes at the outset that the information contained within it is
provided "following a preliminary review of the facts concerning the above-referenced charge and is
subject to appropriate future amendment or clarification." (Plaintiff's Exh. 8, at 1 n. 1.)

Q: Okay. You've never made that statement to anyone at the Association[BGEA],
"Well, I would never have even interviewed her?"
A: I don't *believe* so.

(Beresford Dep., 60-61) Thus, according to Beresford's deposition testimony approximately four

years later, he *believes* he was not asked to produce any correspondence or emails in his

possession until 2009 and doesn't *believe* that he made the comment attributed to him by BGEA.

In its November 2007 EEOC Response, in connection with the Beresford position,

BGEA represented:

> Ms. McCallum's August 16, 2007 interview for the Church Relations
> position did, in fact, occur. However, the administrative assistant position was
> not funded or posted during her tenure with BGEA. In addition, Mr. Beresford
> concluded that, based on the interview and the feedback he had received from
> managers and others about her performance, Ms. McCallum was not the
> individual for the job even if and when it was later approved.

(Plaintiff's Exh. 8, at 6.)

According to Plaintiff, the purported discrepancy between BGEA's Response and

Beresford's deposition testimony gives rise to an inference that BGEA's Response was

pretextual. In the Court's view, no genuine issue of material fact exists. First, this Court is

reluctant to rely on Beresford's testimony to establish a triable issue because his overall memory

is poor and his testimony qualified. Secondly, Beresford's deposition testimony is entirely

consistent with his conduct. Although Beresford does not recall much, Beresford did not seek

McCallum out upon learning that the position had been approved and funded. The fact that

Beresford took no affirmative steps to follow up with McCallum once the position was ready to

be filled is telling, particularly given the temporary work she performed in his department.

Third, Ryback testified that while she was never asked to provide information specifically for the

23

purpose of responding to the EEOC charge filed by McCallum, an EEOC complaint did not fall within her duties and responsibilities as Senior Recruiter. (Ryback Dep., 58-59.). Ryback explained in part:

> "I may have been asked to put together some thoughts and notes on how everything went, but it had nothing to do with any allegation or claim. It was just that when someone is leaving the organization, it's nice to have a background on what we did to try to prevent that."

(Ryback Dep., 9, 59-60.).[20]    According to Ryback, the responsible BGEA Human Resources employee would have conducted an internal investigation and spoken with the persons the complaint pertained to. (Ryback Dep., 59.).

These facts are readily distinguishable from the "rationale-shifting" cases relied upon by the Plaintiff. The Fourth Circuit cases discussing an employer's alleged "shift" in explaining its non-discriminatory reasons for an employment decision, and finding that such a "shift" could be viewed as pretextual, present much clearer instances of an employer's post-hoc rationale. In *EEOC v. Sears Roebuck & Co.*, the employer put plaintiff off for months after assuring him he'd have a job, then changed its rationale from not having funding or hours to hire within the sought-after department, to the selection of someone else (clearly less qualified), to the mistaken belief that plaintiff had been previously investigated for sexual harassment. The Fourth Circuit stated:

> "[L]ooking at the totality of the circumstances, there is ample evidence from which a factfinder could conclude that . . .[the employer's] asserted justification is false. Indeed, the fact that [the employer] has offered different justifications at different times for its failure to hire [plaintiff] is, in and of itself, probative of pretext."

---

[20]   The overall business and economic climate during the relevant time period (2007) is also worth mentioning. The following January, there was a more global reduction in force effort ("a major downsizing") within BGEA that Ryback was subsequently affected by. (Ryback Dep., 9:9-13.).

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir.2001) (internal quotations and citations omitted). Aside from the employer's multiple 180-degree shifts in rationale, the *Sears* panel considered the totality of circumstances and expressly commented on the strength of the plaintiff's *prima facie* case and the "additional evidence" of pretext in rendering its decision to reverse and remand the grant of summary judgment in favor of the defendant-employer.

Similarly, in *Merritt v. Old Dominion Freight Line, Inc.*, the Fourth Circuit described the employer's attempt to rely on a policy that allegedly addressed the efficacy of implementing a physical fitness test to an existing female employee after an injury where 1) the existence of the policy was deemed "dubious" given the lack of evidence in the record concerning it; and 2) the policy and its terms " took shape" on appeal (*i.e.*, during oral argument); and 3) the plaintiff produced evidence that the employer did not faithfully adhere to the policy in that it was applied erratically. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 297-98 (4th Cir.2010).

Here, the purported "shift" is that Beresford *cannot recall* receiving "feedback" from others about McCallum's performance or telling anyone at BGEA that he would not have considered or interviewed Plaintiff for the job.[21] It seems that the inability of a witness to remember certain events, if sincere, presents a different concern than an employer's explicit rationale shift. In any event, a defendant-employer's alleged shift in rationale for an employment decision is just one factor to be considered along with all of the other evidence. *See e.g., Sears*, 243 F.3d at 852 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133

---

[21] This is a far cry from representing that McCallum was the lead candidate for the position or even that the position was hers to lose if she saw fit to apply. The facts here do not present a suspect application of an internal policy or procedure, a re-characterization of Plaintiff's employment eligibility status (internal versus external candidates), or the employer providing new reasons not previously disclosed for the challenged employment decision.

(2000)).   In sum, Plaintiff's evidence does not create a genuine issue of material fact as to whether Defendant's proffered reasons could be deemed pretext.

### b.   The Yokeley Administrative Assistant Position

Next, Plaintiff fails to establish that an equally or less qualified applicant from a non-protected class was hired for the Yokeley Administrative Assistant Position.  In fact, Plaintiff concedes that she was less qualified for the Yokeley position than the successful candidate. Yokeley desired an applicant with a Bachelors Degree, which McCallum did not possess. (Plaintiff Dep., 64:1-3; Plaintiff Decl., ¶5.)  Although Yokeley hired a Caucasian applicant, the applicant possessed a Bachelors Degree in Communications, completed a Communications / Public Relations Internship with the Leukemia and Lymphoma Society, and had previously worked as an Administrative Assistant. Yokeley explained that she deemed Wegenhauser better qualified.  (Yokeley Decl., ¶22.).  The evidence shows that the applicant Yokeley hired possessed superior academic qualifications.

Superior educational qualifications are widely recognized as valid, non-discriminatory bases for employment decisions.  *See e.g.*, *Jimoh v. Charlotte-Mecklenburg Housing Partnership, Inc.*, 2010 WL 1924480 (May 12, 2010 W.D.N.C.) (level of education considered a legitimate, non-discriminatory basis for adverse employment decision); *Wileman v. Frank*, 979 F.2d 30, 37 (4th Cir. 1992) (favoring applicant with education beyond minimum requirement for position is "rational and in no way probative of discriminatory intent").  In *Causey v. Balog*, considering a failure to promote claim under Title VII, the Fourth Circuit expressly held, "[t]his Court is not in a position to second guess executive hiring decisions that are based on legitimate, non-discriminatory rationales such as superior administrative experience." *Causey*, 162 F.3d at 801 (citing *Holmes v. Bevilacqua*, 794 F.2d 142, 146-47 (4th Cir. 1986) (en banc)). The *Causey*

26

panel went on to grant summary judgment in favor of defendant as to that claim, holding that plaintiff's conclusory allegations of age and race discrimination were insufficient to support a finding of pretext. *Id.*

As in *Causey*, Plaintiff fails to meet her burden. There is nothing inherently discriminatory about the selection process undertaken for the Yokeley position. As an initial matter, Yokeley selected McCallum for an interview despite McCallum's race.[22] Ultimately, the job was awarded to a more educated and, arguably, a more experienced candidate. McCallum complains that she was not given the skills test that external Caucasian candidates completed and suggests that she should have been provided an opportunity to demonstrate the superiority of her clerical skills.[23] However, Rybak explained that internal candidates are not typically given skills tests because they are assumed to already possess the minimum qualifications. (Rybak Dep., 54:7-12,19-24.). Pointing to another internal employee (also African American) who, like McCallum, was not required to take the skills test, Ryback stated:

> "As an internal employee, quite honestly we wouldn't put people [McCallum] through that. We would respect the fact that they had good skills in those areas. We used that test as a guideline for people that we didn't know."

(Rybak Dep., 54:19-24.) Because McCallum was still an internal candidate, she was not similarly situated with the external candidates who were initially accorded *less* deference than

---

[22] There is a factual dispute over whether McCallum arrived twenty-minutes late for the interview and whether McCallum discussed her public relations skills during the conversation. However, even assuming that McCallum arrived at the interview on time and did not somehow reveal a bent towards a more skilled public relations-type position, the fact remains that McCallum did not possess the preferred educational background.

[23] McCallum does not produce evidence that she made a request to "prove up" her clerical skills or that such a showing would have made a difference to Yokeley.

27

the existing BGEA work force.[24]   Thus, Plaintiff provides no evidence from which a rational

jury could find that Yokeley's stated reasons for not offering the job to McCallum amounted to

pretext for racial discrimination.

### c. The Proofreader Position

Finally, McCallum concludes that Rybak racially discriminated against her by preventing

McCallum from applying to positions for which she was qualified, suggesting that positions on

the Intranet were filled when the Intranet advertised them as open, and preventing McCallum

from assuming the job Beresford offered. (Plaintiff Dep., 82:19-83:8, 98:2-4.)

Plaintiff maintains that Rybak improperly declined to accept Plaintiff's Expression of

Interest Form for a Proofreader Position. (Plaintiff Dep., 64:15-24.)  Ryback testified that

McCallum took her interest form and left after Ryback informed her that the hiring officer, Chris

Blumenfield ("Blumenfield") in Creative Services, was prepared to offer the position to another

candidate.  (Ryback Dep.,   .)  Ryback received  the message about the actual decision from

Blumenfield at 10:02 a.m. the same day Plaintiff expressed an interest.  (Plaintiff's Exh. 8, at 8.)

Plaintiff nonetheless asserts that because the position was not filled until a week after her

application would have been submitted, Rybak was not justified in refusing to accept

McCallum's form. (Plaintiff Dep., 65:7, 11-15; Plaintiff Decl., Par. 10.)

Accepting Plaintiff's version of the facts as true, the elements of a *prima facie* case are

not met.  Plaintiff does not provide evidence suggesting that the qualifications (or prior work

experience) of the individual ultimately selected were inferior to Plaintiff's own credentials, or

that the successful candidate was a member of a non-protected class. Therefore, Plaintiff has

---

[24] The same BGEA policy of hiring from within the organization that disadvantaged Plaintiff with
the Beresford hiring process was advantageous to her in other areas.

failed to state a *prima facie* case of discrimination for the Proofreader Position.

Moreover, there is no evidence of pretext. McCallum was simply too late to be considered. The Proofreader Position had been advertised within BGEA for a period of time and interviews had already occurred. (Ryback Dep., 53.). Just hours before McCallum had any discussion with Ryback about the Proofreader Position, Blumenfield requested Ryback's guidance in formally extending the offer of employment to the chosen applicant. (Plaintiff's Exh. 8, at 8; Ryback Dep., 53.) Plaintiff admits that she had no reason to believe that the information Rybak shared with her was incorrect. (Plaintiff Dep., 65:13-15.)

## IV. CONCLUSION

In conclusion, a jury could not reasonably find or infer that discrimination was a motivating factor in any of the challenged employment decisions of BGEA. Moreover, because this Court finds that Plaintiff has failed to provide sufficient evidence suggesting BGEA engaged in racial discrimination for purposes of Title VII and Section 1981, Plaintiff's claim for discrimination in violation of North Carolina Public Policy lacks merit and is similarly insufficient. *See Anderson*, 2008 WL 4596238, *14. This Court has already dismissed Plaintiff's separate retaliation claim because Plaintiff's claim is outside the scope of Title VII and because no private right of action exists under North Carolina law for retaliation.[25]

---

[25] To the extent the Court's August 5, 2011 Memorandum and Order was unclear, Plaintiff's retaliation claim – no matter how it might have been couched by Plaintiff – has been dismissed. Title VII only protects employees from discriminatory *employment practices*. *See Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir.2011). North Carolina law does not provide for a separate claim of retaliation. *See McLean v. Patten Communities, Inc.*, 332 F.3d 714, 719 (4th Cir.2003)) (no private right of action under North Carolina law for retaliation under NCEEPA, N.C. Gen. Stat. §143-422.2.)

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Dismiss pursuant to Rule 12(b)(1) be **DENIED,** and Defendant's Motion for Summary Judgment be **GRANTED**.

Plaintiff's request for oral argument is rendered **MOOT**.

Signed: October 5, 2012

Richard L. Voorhees
United States District Judge